REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 600

September Term, 2016

_____

MANEKIN CONSTRUCTION, INC.

v.

MARYLAND DEPARTMENT OF GENERAL
SERVICES

_____

Woodward, C.J.
Berger,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed:  June 28, 2017

This appeal arises from the circuit court's order affirming the decision of the Maryland Board of Contract Appeals (the "Board") to grant summary decision in favor of the Department of General Services of Maryland ("DGS"), appellee. On June 9, 2010, appellant Manekin Construction, LLC ("Manekin") was awarded a contract with DGS to construct a two-story barrack and a one-story garage for the Maryland State Police in Hagerstown, Maryland. The contract price totaled more than eight million dollars and was subject to mutually agreed upon Proposed Change Orders ("PCOs"). As we discuss in detail below, Manekin submitted PCO No. 68 to DGS requesting additional compensation during the construction of the project. After the project was complete, Manekin submitted a "Request for Equitable Settlement" on March 18, 2013. After DGS's procurement officer denied Manekin's claim for compensation, Manekin appealed to the Board. On September 17, 2016, during a hearing on the merits of the claim, the Board stopped the proceedings and granted DGS's Third Motion for Summary Decision. The Circuit Court for Howard County affirmed the Board's decision. This appeal followed.

The primary issue we must decide on appeal is whether the Board erred when it stopped the evidentiary hearing and granted summary decision in favor of DGS. More specifically, we must decide whether the Board improperly made findings of fact on disputed issues, including whether Manekin knew or should have known that DGS disputed or rejected Manekin's request for compensation detailed in PCO No. 68. For the reasons explained below, we hold that the Board erred in its decision to grant summary decision in favor of DGS.

**BACKGROUND AND PROCEDURAL HISTORY**

Construction of the barrack and garage took place from June 21, 2010 until the project was substantially complete on or around July 26, 2012. Approximately every two weeks throughout the construction process, Manekin and DGS officials held meetings ("Progress Meetings") to discuss Manekin's progress and other issues. During performance of the construction, Manekin encountered certain difficulties that it attributed to delays caused by DGS (among other reasons) and submitted numerous PCOs, thereby requesting additional compensation. On November 2, 2011, Manekin notified DGS of the "cumulative impact and ripple effect of" certain factors. On December 7, 2011, Manekin submitted PCO No. 68, requesting compensation for the "additional time, and associated general conditions costs resulting from changes" discussed in the November 2, 2011 letter. A letter attached to PCO No. 68 detailed the changes requested, including the five "impact factors" that affected the cost of the project. Manekin and DGS discussed PCO No. 68 at three Progress Meetings, during which the issue was designated as "void" in the minutes for Progress Meetings and in the "PCO Log."

After the completion of the project, on or around March 18, 2013, Manekin sent a "Request for Equitable Settlement" to DGS requesting compensation for additional time caused by the same five impact factors as outlined in PCO No. 68. DGS denied the request in a letter dated April 3, 2013. DGS indicated in its letter, "if you wish to further pursue this matter, you may do so in accordance with COMAR [Code of Maryland Regulations] 21.10.04 and the Contract Documents, General Conditions, Section 6.13, 'Disputes and Contract Claims.'" On April 10, 2013, Manekin submitted its notice of claim, and on

2

April 29, 2013, submitted its formal claim to the procurement officer. The procurement officer denied Manekin's claim on November 12, 2013, finding that the notice of claim was not submitted within thirty days of when Manekin knew or should have known of the basis of a claim. Manekin timely appealed to the Board.

On September 17, 2016, the Board stopped the proceedings and granted DGS's pending Third Motion for Summary Decision, finding that Manekin knew of the basis of its claim by no later than March 1, 2012, which was more than thirty days before Manekin submitted its notice of claim. On September 21, 2015, the Board issued a written order. Manekin filed a petition for judicial review in the Circuit Court for Howard County. After a hearing on April 21, 2016, the circuit court affirmed the Board's grant of summary decision in a written opinion issued on April 27, 2016.

### DGS Contract & Relevant COMAR Provisions

The "Department of General Services General Conditions for Construction Contracts (Revised March 2007)" contains the conditions of the contract between DGS and Manekin. As required, the contract incorporates the language of COMAR 21.07.02.05-1.[1] Under a section of the contract entitled "6.13 Disputes and Contract Claims (COMAR 21.07.02.05-1)," the contract provides that it is "subject to the provisions of State Finance

---

[1] Similarly, COMAR 21.10.04.02 provides the following:

> Unless a lesser period is prescribed by law or by contract, a contractor shall file a written notice of a claim relating to a contract with the appropriate procurement officer within 30 days after the basis for the claim is known or should have been known, whichever is earlier.

3

and Procurement Article, Title 15, Subtitle 2, Annotated Code of Maryland, and COMAR 21.10." The following are other pertinent provisions incorporated in the contract from COMAR 21.07.02.05-1:

> B.     Except as otherwise provided in this contract or by law, all disputes arising under or as a result of a breach of this contract that are not disposed of by mutual agreement shall be resolved in accordance with this clause.
>
> C.     As used herein, claim means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract. A voucher, invoice, or request for payment that is not in dispute when submitted is not a claim under this clause. However, if the submission subsequently is not acted upon in a reasonable time, or is disputed as to liability or amount, it may be converted to a claim for the purpose of this clause.
>
> D.     Within 30 days after Contractor knows or should have known of the basis for a claim relating to this contract, Contractor shall file a written notice of claim with the procurement officer.
>
> * * *
>
> F.     The claim shall set forth all the facts surrounding the controversy. Contractor, at the discretion of the procurement officer, may be afforded an opportunity to be heard and to offer evidence in support of the claim.

## *PCO No. 68*

On December 7, 2011, Manekin submitted PCO No. 68 providing two methods for calculating the amount of compensation it asserted to be due for the five impact factors discussed in PCO No. 68 -- a "Change Order Analysis" and a "Measured Mile Approach." Manekin notes in the PCO that, although these two methods produced two different time

4

calculations, they were intended to provide a basis for further negotiations. Manekin relied on its "General Requirements Costs" of $1,315.00 per day, as provided in the original contract with DGS, and requested 96 days of "Contract Time Extension" plus other expenses, for a total of $128,134.00. Within the PCO, however, Manekin "reserve[d] the right to request compensation for all direct and indirect costs attributable to this delay impact." At the end of PCO No. 68, Manekin added, "We believe our calculations to be reasonable and an appropriate representation of the impacts to Manekin on this project. However, we are willing to meet and negotiate an acceptable compromise without this matter escalating to another level." Thereafter, the parties' representatives discussed PCO No. 68 at multiple Progress Meetings.

*PCO Log*

The PCO Log is a record of all PCOs as well as each PCO's status. The status of each PCO is indicated in the "Remarks/Days" column. Some of these status designations include "VOID," "REJECTED," "CREDIT," and various phrases such as "No charge VOID," "Located in PCO #13 VOID," or "G.C. agrees to amt." Additionally, in the date column, either the date of the action is indicated or, if the PCO's status is "VOID," only the word "VOID" is listed in place of the date. A column labeled "PCO AMT." lists the amount requested for each PCO, and a column labeled "DGS EST." lists the amount to be added to the total amount due to Manekin. For any item designated as "VOID," the "DGS EST." is either blank or has a value of "$0.00." At the end of the PCO Log, the total "DGS EST." indicated is $1,232,918.00.

5

For PCO No. 68, which is described as "Time Extension Request to justify new schedule," the table indicates a "PCO AMT." of $128,134.00, and the term "VOID" is included under the "REMARKS/DAYS" column and in the date column. For comparison purposes, PCO No. 22 ("Soil Fill Material Phase #1), which had a "PCO AMT." of $117,642.00, is recorded as "REJECTED" in the "REMARKS/DAYS" column. PCO No. 70 ("Revise Membrane @ Phse Chimney Caps"), on the other hand, is listed as "No charge VOID" and no amount was added to the total.

*Progress Meetings*

The record before the Board contained the minutes for each relevant Progress Meeting, including Progress Meetings 37, 38, and 39. The minutes for each Progress Meeting include the names of persons attending, who would receive a copy of the minutes, a synopsis of the progress of the project as of that date, and notes of the topics discussed at the meeting. The minutes from Progress Meeting 37, held on January 5, 2012, include a section entitled "Time Extension PCO Discussion" containing eighteen points of discussion. The relevant portion of the minutes from Progress Meeting 37 includes the following:

> 14. J. Rohrbach tentatively said that with correct back-up:
>    a. PCO 63 -- 6 days
>    b. PCO 68 -- VOID
>    c. PCO 73 -- 10 days
>
> 15. Dan Sharpe offered March 1, 2012 and leave open on compensational [sic].[2]

---

[2] As we discuss *infra*, whether the notation indicated that Manekin had committed to providing the fragnets by March 1, 2012 was not established at the evidentiary hearing as an undisputed fact.

18. Tentative Schedule:
  -- February 15, 2012 -- Develop 'work list'
  -- March 1, 2012 -- Substantial Completion Punch List
          and begin Barrack move
  -- Within 60 days (May 1, 2012) the following items will
     be placed on punch list and complete:
          - Abatement
          - Demo
          - Landscape
          - Paving
          - Fuel System

The revised minutes for Progress Meeting 38, which was held on January 19, 2012, reference the need for "fragnets" for PCO No. 68. A fragnet is a detailed analysis of how particular factors impacted the construction project, such as when and how the contractor lost scheduled time. The minutes indicate that the parties continued to discuss PCO No. 68., referenced by the following notation:

VOIDED   AA. PCO 068 -- Rock extension is not approved
                to April 14, 2012.
          Day after Jan. 27, 2012 Liquidated Damages
             will be accessed [sic].
          Fragnets must be submitted and part of the
             time extension.
       01-05-12   VOIDED.

Finally, the minutes from Progress Meeting 39, held on February 2, 2012, included the same notations under points 14, 15, and 18 as the minutes from Progress Meeting 37, with the addition of the following notes added to point 18:

01-19-12     52 days currently being allowed for extension.
02-02-12     Substantial Complete is now May 1st (Added
             131 days)

*Hearing Before the Board and the Board's Decision*

In a letter dated August 7, 2015 from Board Member Dana Dembrow, the Board notified the parties of the trial date for Manekin's appeal of the procurement officer's denial of its claim. The brief letter included the following:

> As you know, there are three (3) Motions pending for Partial Summary Decision in this matter, which is currently scheduled for trial on September 14, 2015.
>
> Counsel understand that the pending Motions must be based on factual matters as to which there is no genuine dispute, and that all factual inferences must be resolved in favor of the adverse party at this point in the proceeding.
>
> At the present time, the Board does not anticipate making any decision on the pending Motions until after evidence is presented at trial. Of course, counsel are also free to renew Motions during the course of trial as evidence is adduced.
>
> We hope this correspondence is useful to your trial preparation.

Hearings before the Board were held on September 14, 16, and 17, 2016. The only witness to testify before the Board ended the proceedings by granting DGS's motion for summary decision was Daniel Sharpe, Vice President and Project Manager for Manekin. Sharpe testified regarding when he became aware that DGS had denied the request contained in PCO No. 68. The following colloquy between the Presiding Member of the Board and counsel for DGS ensued:

> PRESIDING MEMBER DEMBROW: . . . Now, frankly, . . . there's nothing in this affidavit that says what Mr. Rohrbach intended by the word void or voided. And that's the crux of the issue. [ . . . ] We're still trying to figure out what was meant by void. So hopefully we'll get to that point. [ . . . ] [Y]ou've made a very effective point that the State told the Appellant this PCO 68 was void. Okay.

8

[COUNSEL FOR DGS]: Mr. Dembrow, . . . I gave you a Daniel Webster's Dictionary definition of the word void. [ . . . ] You're not going to get anything more from the State. We just -- we use English words . . . . And [counsel for Manekin] will agree with me, the word void isn't defined anywhere in the contract.

PRESIDING MEMBER DEMBROW: . . . I've been waiting to hear from Mr. Rohrbach. In this affidavit he . . . reiterates that he uses the word void. It seems odd that he doesn't say PCO 68 was rejected. What it says is it was void. And it further says that it was void with the opportunity to submit or the request and requirements to submit fragnets. And Mr. Sharpe, if we can [direct] your attention to the progress meeting on January 5, 2012 . . . that's where the progress meeting reports say, quote, Dan Sharpe offered March 1, 2012 and leave discussion open on compensational. Whatever that means . . . .

Counsel for DGS returned to questioning Sharpe and asked whether his belief "in his mind" that the issue in PCO No. 68 was left open had been documented. After Sharpe pointed to the Progress Meeting minutes notation "leave open on compensational [sic]," Presiding Member Dembrow added the following:

PRESIDING MEMBER DEMBROW: I think he has . . . I think that the progress meeting notes are consistent with what he said. He's saying that he asked for the compensation to be left open, and the minutes of the progress meeting say leave discussion open.

Thereafter, Presiding Member Dembrow interrupted cross-examination to ask a question directed at counsel for DGS:

PRESIDING MEMBER DEMBROW: . . . Mr. Rohrbach is not going to testify, is that correct?

[COUNSEL FOR DGS]: I haven't made that decision yet, sir.

9

PRESIDING MEMBER DEMBROW:  I'm curious to know why it says in the affidavit that he never told anyone that they could wait until a later date, but all the notes reflect that they're asking for fragnets.  They're requiring fragnets.  They want proof that it's on the critical path.  Obviously there was an anticipation that [Manekin was] going to submit something or [DGS] wouldn't have required and requested it.  And . . . that's sort of a mystery at this point. [ . . . ]  [H]e voided and asked for fragnets. That's the dilemma. That's the dichotomy.

[COUNSEL FOR DGS]:  No, no, no, that's not what his . . . if you . . . Mr. Dembrow, it says that he repeatedly had questions -- conversations with Chris Mento where Dan Sharpe was not present and he repeatedly said this is what I need, and they never came forward.  [ . . . ]

PRESIDING MEMBER DEMBROW:  That makes your claim clearer.  I'm sure [counsel for Manekin] has a different point of view. We're going to hear evidence about that. [ . . . ]

I interjected.  I'm putting the State on fair notice where we need, where at least I need clarification.  And that goes to the question of what they meant when they said voided give us fragnets.  We're trying to get to that, and the parties have opposite points of view. So let's just try to go through the . . . evidence as we should with the next, with another question of Mr. Sharpe.

* * *

[Redirect by counsel for Manekin]

Q.      . . . Your request for payment . . . for ripple effects, was that in dispute at the time you submitted it?

A.      No.

Q.      Was PCO 68 in dispute at the time you submitted it?

A.      No.

10

Chairman Collins interjected during redirect with additional questions directed at Sharpe, which were focused primarily on why Sharpe had not filed a claim after PCO No. 68 was marked "VOID."

> A.      . . . I didn't feel that I had any claim or anything at the time when I was going through these things initially 'cause we were trying to work through them.

> * * *

> CHAIRMAN COLLINS:  . . . Because you thought in your mind we can do it all at the end. When in reality the general conditions said you had to do it within 30 days of when you should have known. [ . . . ]  That's the trouble I'm having as a Board Member here --

> A.      But Mr. Collins, what I would like to answer back --

> CHAIRMAN COLLINS: Yeah, [p]lease do.

> A.      -- is I really . . . didn't know . . . I had a dispute going on.  I was asked to try to produce a fragnet which I worked vigorously to try to do, and I was -- because I never could really produce that fragnet that stated all these different things, that's the reason why I felt that . . . I wasn't like in a . . . claim mode or this major dispute mode 'cause I was still trying to figure a way to produce the evidence or the backup that the State was asking for. [ . . .]

> CHAIRMAN COLLINS:  Yeah, but even though you knew, you knew that it was gone.

> A.  Well, it wasn't . . . really gone.

> CHAIRMAN COLLINS:  Well, yeah, it was really gone.  Mr. Mento acknowledged it was really gone, and so did Mr. Rohrbach in this deposition say it was really gone.  What he did say, so we are going to void this, and you can come back later.  This is null and void.  This is gone.  But you know if you can produce that fragnet down the road show me another PCO.

11

Well when someone says that to me . . . you got to say to yourself at that point, there's a potential claim.

[By counsel for Manekin]

Q. . . . [The] question to you is was there a dispute that had arisen during this process that you could file a notice of claim?

A. Not at the time . . .

Q. Why not?

A. Because we didn't receive any official thing. Except I understand the conversations that were had, but we were still having basically ongoing meetings, ongoing discussions about a lot of different things on the project, and I didn't get, until I got that letter slammed back at me[,] that was when I realized I didn't really have a --

Q. Which letter?

A. . . . It was a letter that came back from the State which was from DGS that basically denied . . . everything. . . .

Q. . . . Mr. Collins' point was that you knew that there was at least that PCO 68 was void. [ . . .]

A. Well it didn't mean to me it was off the table. It meant to me that I still had to come back, . . . and once I produced the additional backup that I could bring that thing back up.

Near the conclusion of Sharpe's testimony, the Board stopped the proceedings and granted DGS's Third Motion for Summary Decision. Presiding Member Dembrow provided the following rationale for the Board's Decision:

Okay. At this time there will not be a need for recross-examination because the Board has unanimously determined to grant the State's Motion for Partial Summary Judgment Number 3. After listening carefully to the testimony of Mr. Sharpe, who is the Vice President of the Appellant Construction Company, Manekin, and the Project Manager on

12

this job, it is clear that even giving the Appellant the benefit of all doubt the ripple effect claim was first raised to the State by correspondence November 2, 2011. It was formally submitted as a proposed change order on December 7, 2011. And the very next day the State indicated to Appellant that that PCO was, quote, void, end quote. Now that was clear in the mind of some of the Members of the Board that that meant reject. But giving Appellant the benefit of all doubt, because there is a bit of a nuance in that DGS also noted on that voiding of that PCO that they wanted fragnets. The Board notes that the last request, and there are a couple of them at least, that the State made of the Appellant to submit the fragnets needed to support PCO 68, the last reference to fragnet was made on January 19, 2012.

There was a progress meeting on February 2, 2012, and in the minutes of that progress meeting, the minutes being dated February 7, 2012, there is reference that Mr. Sharp[e] stated or at least the minutes state, quote, Dan Sharpe offered March 1, 2012 and leave discussion open on compensational, period. That's certainly not an example of the greatest grammar because it's somewhat difficult to know what that even means. But it does appear beyond a shadow of a doubt that on February 2, 2012, when PCO 68 was marked void there was no reference to fragnets at that point. There had not been a reference for the need for further documentation by way of fragnets since January 19, 2012. At least as of February [2nd] Mr. Sharpe was saying we'll do this by March 1, 2012.

[COMAR 21.10.04.02] says . . . a contractor shall file a written notice of a claim relating to a contract with the appropriate procurement officer within 30 days after the basis for the claim is known or should have been known. It appears that the basis of the claim was initially known back in November of 2011. It certainly was known as of February 2012. But this claim was not filed until a year later. So even if we give the . . . Appellant the benefit of all doubt and give them [until] March 1, 2012, as the trigger date for the beginning of that 30-day statute of limitations, we're still a year late. And the Board is directed by [COMAR 21.10.04.02C], quote, a notice of a claim or a claim that is not filed within the time prescribed shall be dismissed. Emphasis on the word shall.

13

> Fair or unfair, that [is] what the regulation requires. [. . .] The Board has no choice but to not address the substantive merits of a claim that is filed a year late. And the Board concludes that that is the correct categorization of this appeal. Therefore, it will be dismissed at this time without the necessity of further testimony.

Presiding Member Dembrow confirmed that the other Board Members concurred in the decision before adding the following:

> We wanted to hear testimony from Mr. Sharpe and give the Appellant the benefit of all doubt. We are comfortable that we've done that now. So this was not a decision made in haste, but one that we've been thinking about for a long time. And the testimony . . . confirmed the view of some of the Board Members a long time ago.

### *The Circuit Court's Affirmance of the Board's Decision*

On April 27, 2016, the Circuit Court for Howard County affirmed the Board's decision to grant summary decision. The written opinion of the circuit court provides, in pertinent part:

> The parties' first dispute is over the standard of review to be applied by the Circuit Court in reviewing the decision of an administrative agency. . . . Specifically, Manekin argues that the VOID notation indicated it was to provide more documentation or information, and that it's right to appeal did not attach until its more formal claim letter was denied 14 months later. [ . . . ]

> DGS reminds the Court that because of the MSBCA members' familiarity with the subject matter, state procurement law, and expertise in that area, the appellate decisions and statutes allow the Court a very limited scope of review. [ . . . ]

> When the Court is reviewing a final decision of an administrative agency, the Court determines the legality of the decision and whether there was "substantial evidence" from the record as a whole to support the decision. [ . . . ]

14

> Case law is clear that the Circuit Court[] is not to make findings of fact. That function is entirely within the realm of the agency, as is determining the inferences to be drawn from those facts. [ . . . ] Even though the final decision was reached by way of a ruling on a motion for summary decision, and not as the result of a contested hearing, the analysis is the same. . . . The Court must determine if the findings of fact are supported in the record by substantial evidence, and if so, whether the decision of the agency was legally correct.

(Citations omitted).

After articulating this standard of review,[3] the circuit court analyzed the Board's decision and characterized the Board's findings regarding notice as a "finding of fact."

> The [Board] made a finding of fact that Manekin was on notice of DGS's denial of its requests under PCO 68 by the end of February 2012 when Presiding Member Dana Dembrow stated, "It appears that the basis of the claim was initially known back in November of 2011. It certainly was known as of February 2012. But this claim was not filed until a year later. So even if we give the [] Appellant the benefit of all doubt and give them [until] March 1, 2012, as the trigger date for the beginning of that 30-day statute of limitations, we're still a year late." [ . . . ] This finding of fact was supported in the record by the Progress Meeting Notes for January 5, 2012, January 19, 2012, and February 2, 2012 which were received as evidence at the [Board] hearing. Reasoning minds examining this evidence could reasonably reach the conclusion that Manekin was on notice (knew or should have known) that DGS denied its claim for costs under PCO 68 by the end of February 2012. Inferences were resolved in Manekin's favor when the Presiding Member gave Manekin until March 1, 2012.

Thereafter, the circuit court affirmed the Board's determination finding that DGS was entitled to summary decision as a matter of law.

---

[3] We note, preliminarily, that the circuit court relied upon an incorrect standard of review, as we discuss in further detail below.

15

**DISCUSSION**

**I.      Judicial Review of an Agency's Conclusions of Law**

The Court of Appeals has explained that we "look[] through the circuit court's . . . decision[], although applying the same standards of review, and evaluate[] the decision of the agency." *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 681 (2007).  In other words, we "review[] the agency's decision, not the circuit court's decision."  *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md. App. 264, 273 (2012) (citation omitted).  We review questions of law *de novo*.  *See Assateague Coastkeeper v. Md. Dep't of the Env't*, 200 Md. App. 665, 690 (2011).

We note that "[a]n administrative agency's interpretation of a statute that the agency administers should ordinarily be given considerable weight by reviewing courts," *Piney Orchard Cmty. Ass'n*, 231 Md. App. at 92 (citation omitted); however, we owe no deference to an agency's erroneous conclusions of law.  *See Bd. of Cnty. Comm'rs for St. Mary's Cnty. v. S. Res. Mgmt., Inc.*, 154 Md. App. 10, 34 (2003) (citations omitted) ("[W]here an administrative agency renders a decision based on an error of law, we owe the agency's decision no deference.").  "In contrast to administrative findings of fact, questions of law, including the proper construction of a statute, are subject to more plenary review by the courts."  *Md. Office of People's Counsel v. Md. Pub. Serv. Comm'n*, 226 Md. App. 483, 501 (2016) (quoting *Office of People's Counsel v. Md. Pub. Serv. Comm'n*, 355 Md. 1, 14 (1999)).

Although we "review[] the agency's decision, not the circuit court's decision," *Long Green Valley*, *supra*, 206 Md. App. at 273, we note that the circuit court's recitation

16

of the "substantial evidence" standard of review as the appropriate review of an administrative agency's summary decision was incorrect. The circuit court noted that the Board's "finding of fact that Manekin was on notice of DGS's denial of its requests under PCO 68 by the end of February 2012 . . . . March 1, 2012 at the latest" was supported by "substantial evidence." Further, the circuit court found the Board's finding of March 1, 2012 as an "inference[] . . . resolved in Manekin's favor." The circuit court, therefore, erred in determining whether there was substantial evidence in the record to support the Board's findings of fact. That error compounded the Board's error in making findings of fact on disputed issues prior to the conclusion of Manekin's presentation of evidence on the issue. Although DGS attempts to provide us with support for the circuit court's review and argues that "this Court should apply a more deferential 'substantial evidence' standard of review," we reject this assertion. The correct standard of review, at both the circuit court level as well as for this Court, is whether the Board's decision to grant summary decision in favor of DGS was correct as a matter of law. *See Eng'g Mgmt. Servs. v. State Highway Admin.*, 375 Md. 211, 228-29 (2003) (citations omitted) ("The standard for appellate review of a summary judgment is whether it is "legally correct. [ . . . ] This is the same standard of review we apply to the question of the legal correctness of an administrative agency's decision."). Because the Board made its decision on a motion for summary decision, we examine whether the Board's decision was correct as a matter of law.

## II. Summary Decision Standard & State Procurement Contract Framework

Critically, only when there is no genuine dispute of material fact may the Board determine whether a party is entitled to summary decision as a matter of law. COMAR 21.10.05.06D provides the following:

> (1) A party may move for summary decision on any appropriate issue in the case.
>
> (2) The Appeals Board may grant a proposed or final summary decision if the Appeals Board finds that:
>
> > (a) After resolving all inferences in favor of the party against whom the motion is asserted, there is no genuine issue of material fact; and
> >
> > (b) A party is entitled to prevail as a matter of law. [4]

The Board's two-step process in deciding a motion for summary decision begins with the determination of whether there is any "genuine issue of material fact." COMAR 21.10.05.06D(2)(a). If the moving party is unable to demonstrate that no material fact is in dispute, the analysis ends and summary decision is not appropriate. Only "[a]fter resolving all inferences in favor of the party against whom the motion is asserted" and finding that "there is no genuine issue of material fact" should the Board determine whether the moving "party is entitled to prevail as a matter of law." COMAR 21.10.05.06D(2).[5]

---

[4]  This standard for summary decision in administrative decisions provided by COMAR 21.10.05.06D is similar to the standard for summary judgment, as provided by Maryland Rule 2-501(a): "Any party may file a written motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law."

[5]  The Board itself acknowledged these criteria in its letter of August 7, 2015, reminding the parties that "the pending Motions must be based on factual matters as to

18

Put differently, the Board is not authorized to make findings of fact on material issues that remain in dispute. To the extent the court considers a disputed fact, the court must view that fact in favor of the nonmoving party and determine whether the moving party is entitled to summary decision.

## III.    The Board Erred In Granting DGS's Third Motion for Summary Decision.

We have explained that contract claims arising out of state procurement contracts are subject to statutorily-prescribed administrative procedures. *See McLean Contracting Co. v. Md. Transp. Auth.*, 70 Md. App. 514, 523-24 (1987). The mandatory claims process is set forth in Maryland Code (2009, 2015 Repl. Vol.), State Finance & Procurement Article (SFP), Title 15 and COMAR 21.10. COMAR 21.07.02.05-1D provides, "[w]ithin 30 days after contractor knows or should have known of the basis for a claim relating to this contract, contractor shall file a written notice of claim with the procurement officer." Further, "[a] notice of claim or a claim that is not filed within the time prescribed in Regulation .02 of this chapter shall be dismissed." COMAR 21.10.04.02C.

### A.    Knowledge Of A Basis For Submitting A "Request for Payment" That Is Not In Dispute When Submitted Does Not Establish Knowledge Of "A Basis For A Claim."

To determine whether Manekin failed to comply with the timing requirements, the Board was required to consider whether Manekin "[knew] or should have known of the basis for a claim" more than thirty days before it submitted its notice of claim to the

---

which there is no genuine dispute, and that all factual inferences must be resolved in favor of the adverse party at this point in the proceeding." Thereafter, the letter provides that the parties should prepare for trial accordingly.

19

procurement officer on April 10, 2013. *See* COMAR 21.07.02.05-1D. To apply this provision correctly, therefore, the Board was required to make a finding of fact, accurately identifying "a *basis* for a claim" pursuant to COMAR 21.07.02.05-1. A "claim" is defined in the following provision:

> As used herein, claim means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract. A voucher, invoice, or **request for payment that is not in dispute when submitted is not a claim** under this clause. However, **if the submission subsequently is not acted upon in a reasonable time, or is disputed as to liability or amount, it may be converted to a claim** for the purpose of this clause.

COMAR 21.07.02.05-1C (emphasis added).

Pursuant to COMAR 21.07.02.05-1C, a contractor's knowledge of the basis for "request[ing] payment that is not in dispute when submitted" is not the same as having knowledge of the basis of a "claim." Manekin's submission of a PCO, therefore, is not dispositive evidence of having knowledge of the basis for a claim. Once a request for payment is disputed, however, a claim arises. The thirty-day limitations period under COMAR 21.07.02.05-1D would begin, therefore, once the contractor knows or should have known of a dispute or denial of its request.

As we have explained *supra*, although we attribute some weight to an agency's expertise and its interpretation of a statute that it administers, we review questions of law *de novo*. *See Assateague Coastkeeper*, *supra*, 200 Md. App. at 690. Here, however, the Board in its decision provided no interpretation of COMAR 21.07.02.05-1. Indeed, in

20

explaining the Board's decision, Presiding Member Dembrow stated, "[i]t appears that the basis of the claim was initially known back in November of 2011," referring to the date that Manekin first raised the issues contained in PCO No. 68 in a letter to DGS prior to submitting PCO No. 68. It is not clear, therefore, whether the Board equated having knowledge of a basis for submitting a request for payment that was not in dispute when submitted with a "basis for a claim."

Although the Board's prior interpretations of a statute do not create mandatory authority for this Court, we note that the Board's application of the timing provisions in COMAR 21.07.02.05-1 in this case is inconsistent with the Board's own interpretations in some of its prior decisions. For example, in *Info. Sys. & Networks Corp.*, MSBCA No. 2225 (March 4, 2004), the Board found that the thirty-day limitations period began upon the appellant's receipt of the procurement officer's letter denying the appellant's change order request (i.e. a "PCO"). On January 22, 1999, after the parties had contemplated an increase to the contract ceiling during weekly progress meetings, the appellant submitted a formal request for a change order. Thereafter, the appellant sent the agency two follow-up requests for a decision on its January 22, 1999 request and did not receive a response until the procurement officer's July 23, 1999 denial letter. The Board concluded that the thirty-day limitations period did not begin until the appellant received the procurement officer's denial letter. *Id.* at 13. In its written decision, the Board reached the following conclusions:

> Until [the procurement officer's] letter of July 23, 1999 rejecting Appellant's change order request, Appellant had no reason to believe that its change order was in dispute. Appellant timely filed a notice of claim and claim regarding the Procurement Officer's . . . July 23, 1999 rejection of its

21

> change order request, which was confrontational and put Appellant on notice that it must file a claim.

*Id.*

Similarly, in *David A. Bramble, Inc.*, MSBCA No. 2823 (July 5, 2013), the Board found that the contractor's notice of claim was not timely because the contractor admitted that he had actual notice of the agency's *rejection* of his proposal more than thirty days before filing a notice of claim. In *Syscom, Inc.*, MSBCA No. 2268 (July 5, 2002), the Board found that a dispute triggering the limitations period did not arise prior to the procurement officer's decision that the agency's additional reporting directives to the contractor were within the scope of the underlying contract. *Id.* at 8. Notably, in that case, the contractor had previously sent a letter to the agency, refusing to carry out the directives without an approved change order. *Id.* at 2.

In these decisions, the Board's findings are consistent with our interpretation in this case of COMAR 21.07.02.05-1C and D -- that the thirty-day limitations period begins when the contractor has notice that the agency disputes the contractor's request. In determining whether Manekin complied with the timing requirements, the Board was charged with deciding whether Manekin had notice from DGS that DGS disputed or denied its request contained in PCO No. 68 more than thirty days before Manekin filed its notice of claim.

22

**B.** **The Board Made Findings of Fact on Disputed Issues by Determining the Meaning of "Void" and that Manekin was to Provide Additional Information by March 1, 2012.**

In addition to finding that Manekin knew of the issues raised in PCO No. 68 as early as November 2, 2011, the Board found, alternatively, that Manekin should have known that DGS disputed the request contained in PCO No. 68 by February 2012. In so doing, the Board relied primarily on notations in the PCO Log and Progress Meeting minutes to make at least two improper findings of fact prior to a full hearing on the merits. Critically, both of these factual conclusions were determinative in its decision.

First, the Board relied, in part, upon the fact that PCO No. 68 was designated as "VOID" in the PCO Log to conclude that Manekin knew or should have known of the basis of a claim by December of 2011, and "certainly . . . as of February 2012." Presiding Member Dembrow explained the Board's reliance on the "VOID" notation in the following portion of the Board's decision:

> [I]t is clear that even giving the Appellant the benefit of all doubt the ripple effect claim was first raised to the State by correspondence November 2, 2011. It was formally submitted as a proposed change order on December 7, 2011. And the very next day the State indicated to Appellant that the PCO was, quote, void, end quote. Now that was clear in the mind of some of the Members of the Board that that meant reject. [ . . . ]
>
> * * *
>
> It appears that the basis of the claim was initially known back in November of 2011. It certainly was known as of February 2012. But this claim was not filed until a year later.

At various points during the evidentiary hearing, however, Presiding Member Dembrow emphasized the need for additional clarification. Presiding Member Dembrow

23

found the term "void" particularly troubling in relation to the undisputed fact that the minutes from Progress Meetings 37 and 39 reference a comment by Sharpe to "leave discussion open on compensational [sic]," which the Board acknowledged is difficult to interpret. Further, in addition to the term "void," the PCO Log included the term "rejected" as the status for other PCOs. Presiding Member Dembrow pointed out that Rohrbach admitted during his deposition that there was a difference between the terms "void" and "rejected, explaining that "void" meant "you can come back later." During the evidentiary hearing, Presiding Member Dembrow stated to counsel for DGS, "I've been waiting to hear from Mr. Rohrbach. In this affidavit he . . . reiterates that he uses the word void. It seems odd that he doesn't say PCO 68 was rejected." He later added, "Now, frankly, . . . there's nothing in this affidavit that says what Mr. Rohrbach intended by the word void . . . ." Thereafter, Presiding Member Dembrow informed counsel for DGS, "I'm putting the State on fair notice where we need, where at least I need clarification. And that goes to the question of what they meant when they said voided give us fragnets. We're trying to get to that, and the parties have opposite points of view." As Presiding Member Dembrow stated, "[T]hat's the crux of the issue. [ . . . ] We're still trying to figure out what was meant by void."

The only evidence presented at trial that was relevant to the meaning of the term "void," however, was Sharpe's testimony concerning his understanding of the term. Sharpe testified that he interpreted "void" to mean that the issue would be left open to raise again at a later date, and in this case, not until Manekin had compiled and submitted the information requested. Further, Sharpe testified that he was not aware that DGS disputed

24

Manekin's request until DGS denied Manekin's "Request for Equitable Settlement" on March 18, 2013.

The blurring of the line between a hearing on the motion for summary decision and the evidentiary hearing, during which testimony had already begun, presents procedural challenges. Without hearing Rohrbach's testimony on the merits of the claim, certain Board Members found his deposition testimony and affidavit convincing enough to draw conclusions of fact regarding the meaning of the "void" notation. For instance, Chairman Collins stated to Sharpe during his cross-examination, "Mr. Rohrbach in this deposition [said PCO No. 68] was . . . gone." Chairman Collins paraphrased his understanding of Rohrbach's deposition testimony, in which Rohrbach explained his interpretation of the meaning of "void," in the following way: "[W]e are going to void this, and you can come back later. This is null and void. This is gone. But you know if you can produce that fragnet down the road show me another PCO." Based, in part, on Rohrbach's explanation, Chairman Collins added that Manekin should have known there was a dispute. This factual finding, however, was not permitted at this stage of the proceeding. The parties disputed the meaning of the term "void," which was not defined in relevant statutes or the parties' contract. The Board erred, on a motion for summary decision, in determining whether the notation of "void" indicated that Manekin knew or should have known that DGS had rejected PCO No. 68, and thus, that the basis of a claim had arisen more than thirty days before Manekin submitted its notice of claim.

The Board further erred in finding that Manekin had committed to providing the fragnets for PCO No. 68 by March 1, 2012. The Board reached this finding based on a

25

vague notation contained in the minutes from Progress Meeting 39 held on February 2, 2012.[6]  Presiding Member Dembrow stated as follows:

> [I]n the minutes being dated February 7, 2012,[7] there is [a] reference that Mr. Sharpe stated or at least the minutes state, quote, Dan Sharpe offered March 1, 2012 and leave discussion open on compensational, period. . . . [I]t's somewhat difficult to know what that even means. [ . . . ] [But] [t]here had not been a reference for the need for further documentation by way of fragnets since January 19, 2012.  At least as of February 2nd, Mr. Sharpe was saying we'll do this by March 1, 2012.
>
> * * *
>
> So even if we give the, the Appellant the benefit of all doubt and give them [until] March 1, 2012[] as the trigger date for the beginning of that 30-day statute of limitations, we're still a year late.

During the hearing, however, the Board raised questions regarding why DGS continued to ask for fragnets while designating PCO No. 68 as void.  Indeed, Presiding Member Dembrow acknowledged during Sharpe's testimony that, although Rohrbach stated in his affidavit that he did not tell Manekin that they could later return to PCO No. 68, the minutes reflect that DGS had continued to ask for fragnets while simultaneously marking it as "void."  Presiding Member Dembrow stated, "They're requiring fragnets.

---

[6]  The circuit court's review of the Board's decision supports our finding that the Board made findings of fact that were material to the Board's decision to grant summary decision in favor of DGS.  Indeed, we agree with the circuit court that "[t]he [Board] made a finding of fact that Manekin was on notice of DGS's denial of its requests under PCO 68 by the end of February 2012," because Manekin had not produced the requested fragnets.

[7]  The minutes for Progress Meeting 39 were finalized on February 7, 2012.

They want this information. [ . . . ] Obviously there was anticipation that they were going to submit something or they wouldn't have . . . requested it."

The Board's conclusion that Manekin's Vice President had offered March 1, 2012 as the deadline by which Manekin would provide the fragnets involves a finding of fact on a disputed issue. The Board acknowledged during the proceedings that the notation "Dan Sharpe offered March 1, 2012 and leave discussion open on compensational [sic]" required further clarification. Manekin did not concede that the parties had discussed a particular deadline for Manekin's submission of the fragnets for PCO No. 68. Instead, Sharpe explained during his testimony only that he had requested that the parties leave the issue open.[8] Additionally, other notations within the minutes for Progress Meeting 39, under the same points of discussion, refer to "March 1, 2012" in relation to the notation "Substantial Completion Punch List and begin Barrack move." In other words, whether the notation indicated that Sharpe had agreed to a March 1, 2012 deadline to produce fragnets for PCO No. 68 was not a permissible finding at this stage of the proceedings.

Furthermore, although March 1, 2012 is later than the other dates considered by the Board as potentially starting the limitations period, the finding that the thirty-day period began on March 1, 2012 was not sufficient to "resolv[e] all inferences in favor of the party against whom the motion is asserted." COMAR 21.10.05.06.D(2)(a). Manekin argued that the limitations period did not begin until April 3, 2013, when DGS denied Manekin's

---

[8] Additionally, when the notation was raised during the cross-examination, Presiding Member Dembrow agreed that Sharpe's testimony -- that he had requested the parties keep the issue of PCO No. 68 open -- was consistent with his own interpretation of the meeting minutes.

27

"Request for Equitable Settlement." The Board inferred that Manekin was required to provide fragnets by March 1, 2012, and therefore, that Manekin knew or should have known of a dispute on that date. This inference was not permitted since the relevant COMAR provision directed the Board to resolve all inferences at this stage of the proceeding in favor of Manekin. Based on the Board's determination of March 1, 2012 "as the trigger date for the beginning of [the thirty-day] statute of limitations," however, the Board concluded that Manekin had submitted its notice of claim more than a year late. The Board's conclusion that Sharpe was required to provide the fragnets for PCO No. 68 by March 1, 2012 was, therefore, an improper finding of fact at this stage of the proceeding.

The point at which the thirty-day limitations period began, as the Board has indicated in several prior decisions noted *supra*, is the moment Manekin knew or should have known that DGS rejected or denied the request contained in PCO No. 68. The point in time when Manekin should have known of a denial of its request involves a disputed material fact, which the Board was not authorized to resolve via summary decision. The Board's task was, first, to determine if there existed any "issue[s] of material fact," after resolving all reasonable inferences in favor of Manekin. The Board, therefore, was required to hear the merits of the case and apply the appropriate meaning of "a basis for a claim" under COMAR 21.07.02.05-1 in its final determination.

The Board erred by terminating the proceedings after hearing from only one of Manekin's witnesses. The Presiding Member of the Board stated:

> At this time there will not be a need for recross-examination because the Board has unanimously determined to grant the State's Motion for Partial Summary [Decision] Number 3.

28

> After listening carefully to the testimony of Mr. Sharpe, . . . it is clear that even giving the Appellant the benefit of all doubt the . . . claim was first raised to the State by correspondence November 2, 2011.

Presiding Member Dembrow concluded, "We wanted to hear testimony from Mr. Sharpe and give [him] the benefit of all doubt. We are comfortable that we've done that now." Presiding Member Dembrow added that "the testimony . . . confirmed the view of some of the Board Members a long time ago." Sharpe made no explicit concession during his testimony, however, that was dispositive on the issue of when Manekin knew or should have known that DGS disputed Manekin's request for additional compensation contained in PCO No. 68.

The Board's error in this case stems, primarily, from its failure to adhere to procedural processes. The standards for summary decision as opposed to a merits hearing are fundamentally different. The Board should not consider a motion for summary decision during an evidentiary hearing, unless the rules expressly provide for it. The only evidence presented at the evidentiary hearing at the time the Board stopped the proceedings was testimony that served to confirm that the parties disputed a material fact. The Board, however, made findings of fact on those disputed issues and then granted summary decision. In doing so, the Board blurred the line between determining whether a disputed fact existed and making findings of fact based on the evidence presented at the evidentiary hearing. The Board's consideration of whether to grant summary decision during the proceedings on the merits creates confusion and, as shown here, increases the chance for error by both the Board and the circuit court.

Accordingly, we hold that the Board erred in its decision to terminate the proceedings and grant summary decision in favor of DGS. We, therefore, remand to the Board to decide, after hearing all of the evidence, when DGS communicated a dispute or denial of PCO No. 68 to Manekin such that it knew or should have known that it was required to submit a notice of claim to DGS within 30 days.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. CASE REMANDED TO THE BOARD OF CONTRACT APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**